Ninfa Zerelda **FERNANDEZ**, Plaintiff,

v.

**HY–VEE, INC.**, Defendant.

**No. CIV. A. 00–2249–CM.**

United States District Court,
D. Kansas.

July 11, 2001.

Aldo P. Caller, Kansas City, MO, for plaintiff.

Stanley E. Craven, Spencer, Fane, Britt & Browne, Kansas City, MO, Jeannie M. DeVeney, Spencer, Fane, Britt & Browne, Overland Park, KS, for defendant.

## ORDER

MURGUIA, District Judge.

Plaintiff Ninfa Zerelda Fernandez filed a Title VII employment discrimination suit against defendant Hy–Vee, Inc. alleging that she was sexually harassed while employed by defendant and that defendant retaliated against her for complaining about the alleged harassment, all in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. Pending before the court is defendant Hy–Vee, Inc.'s motion for summary judgment (Doc. 43). For the reasons set forth below, defendant's motion is granted in part and plaintiff's complaint is dismissed in part, as specified herein.

- **Facts**[1]

- **Background**

Defendant owns and operates a grocery store located at 95th and Quivira in Overland Park, Kansas. Plaintiff worked at defendant's store on two different occasions. Throughout both periods of time that plaintiff worked for defendant, defendant had a sexual harassment policy. The policy is included in defendant's Employee Handbook. However, during these time periods defendant did not provide training about its sexual harassment policy and many of defendant's employees were not aware of the policy or ignored it. At least one other employee indicated that he was not aware whether defendant posted the policy in the workplace because he never looked for it. Plaintiff contends that she never became aware of the policy and that defendant allowed sexual harassment to exist in the workplace. However, plaintiff did receive a copy of the Employee Handbook on August 18, 1998 when she first began working for defendant. Plaintiff signed a second Acknowledgment of Receipt of the Handbook on April 23, 1999, but she testified that she does not believe she received a second copy of the Handbook.

Pursuant to defendant's policy, employees are to report any sexual harassment to the manager with whom the employee feels most comfortable. Although plaintiff claims she was unaware of defendant's sexual harassment policy, she admits that she understood that she should report any problems she was having at work to a supervisor or manager with whom she felt comfortable.

Defendant's break policy is as follows: If an employee works four or five hours, the employee is entitled to one 15–minute break. If an employee works six hours, the employee is entitled to one 20–minute break. If an employee works seven hours, the employee is entitled to a 30 minute lunch (off the clock) and one 15 minute break. If an employee works eight hours, the employee is entitled to a 30 minute lunch (off the clock) and two 15 minute breaks. Plaintiff testified that this policy was not carried out in practice. Plaintiff testified that her understanding was that she could take one 20 minute break in the morning and one 20–minute break in the afternoon. Plaintiff sometimes took breaks that were longer than this. Plaintiff occasionally clocked in to work and then went to the kitchen to eat. Several of defendant's employees testified that after Michael Hamilton (the alleged harasser) was terminated, but before plaintiff resigned (when defendant did not have a salad bar manager) they noticed that

---

1. In accordance with the applicable summary judgment standard, the facts are uncontro- verted or related in the light most favorable to plaintiff. Fed.R.Civ.P. 56.

plaintiff frequently abused the break policy by taking long breaks.[2]

- **Plaintiff's First Period of Employment**

Plaintiff began working for defendant in the salad bar in August 1998. At the time plaintiff began her employment, Tim Gilligan was the salad bar manager and Michael Hamilton was a co-worker of plaintiff in the salad bar.

Plaintiff's duties at the salad bar consisted of preparing (chopping) fruits, vegetables, keeping the salad bar fresh, changing salads, and preparing special orders of fruit baskets. This was not the kind of job where someone would have to specifically tell plaintiff what to do on a daily basis.

Plaintiff claims that Mr. Hamilton began sexually harassing her in approximately October 1998. Plaintiff does not claim that anyone other than Mr. Hamilton ever sexually harassed her. Plaintiff claims that Mr. Hamilton followed her around the store and in the parking lot, asking her not to leave. At approximately the same time, Mr. Hamilton also began coming up behind plaintiff and hugging her and kissing the back of her neck and head.

Plaintiff claims Mr. Hamilton hugged her on a daily basis. She claims that he kissed the back of her head and neck more than ten times, and perhaps more than 25 times during the first period of time that she worked for defendant. During plaintiff's first period of employment with defendant, plaintiff alleges Mr. Hamilton also sexually harassed her in the following ways:

- He rubbed his hand and/or arm against her, pretending it was an accident (more than ten times);

- He blocked her exit from a room in the store ("several times," perhaps more than 20);

- He stared at her breasts and rear end in an uncomfortable manner;

- He offered her gifts, saying "this is for us so that we can be friends, lovers, for my girlfriend." Specifically, he offered her a big teddy bear, a bracelet with earrings, and money;

- He stood next to her and put "his organ" up against her leg ("several times," perhaps more than ten);

- He came up from behind her and picked her up ("several times," perhaps more than ten);

- He tried to overhear her telephone conversations with her boyfriend and ask whether and how often they had intimate relations ("several times," probably more than ten);

- He invited her over to his apartment to watch movies ("several times," perhaps more than ten); plaintiff assumes they were adult films because he told her they would make her "feel real good;"

- He kissed her on her arms and put his hands on her waist; and

---

2. Plaintiff attempts to controvert this asserted fact. However, she provides no evidentiary basis for the controversion. Plaintiff may not simply rest upon her pleading to satisfy her burden on summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.* Where plaintiff has not supported her asserted facts as required, the court will not rely upon them when deciding this motion.

- Once or twice a week, he grabbed her by the arms and tried to force her to kiss him.

Plaintiff estimates that Mr. Hamilton did something offensive to her three or four times every time they worked together. She further estimates that they worked together approximately four times a week. Plaintiff always resisted Mr. Hamilton's harassment, pushed him away and told him to stop.

Plaintiff testified that she complained to Jeff Scott, a supervisor in the salad bar area,[3] about this conduct three times, beginning in March 1999. She claims that Mr. Hamilton stopped harassing her for a while after one of her complaints but resumed the harassment soon thereafter.

Plaintiff left Hy–Vee in May of 1999 because of the alleged harassment. Plaintiff testified that she quit her employment at Hy–Vee the first time because of Mr. Hamilton's harassment and because she was afraid of retaliation against herself and her mother for her complaints against Mr. Hamilton. The last day plaintiff worked was May 10, 1999.

- **Plaintiff's Return to Hy–Vee.**

In October 1999, plaintiff decided to return to work for defendant, at the same location, because she wanted to work in the store with her mother. Her mother told her that Mr. Hamilton had become the manager of the salad bar and that she believed he would be more professional. Plaintiff did not apply to work anywhere else between the time she left defendant's employ in May 1999, and the time she began again in October 1999. In October 1999, plaintiff came into the store and asked Jeff Scott if she could return to work in the salad bar. Mr. Scott informed plaintiff that she would need to talk to Robin Duke, the grocery personnel manag-

er, and Mr. Hamilton, the salad bar manager. Plaintiff then talked to Mr. Hamilton, who stated he thought that would be fine, but indicated that plaintiff needed to talk to Ms. Duke. Plaintiff talked to Ms. Duke and told her that she wanted to work days. Plaintiff claims that Ms. Duke agreed she could work the day shift, but she also stated that they needed some help at night. Plaintiff indicated that she could possibly help out one night a week.

Plaintiff's first day of work during her second period of employment was October 18, 1999. When she returned to work, Mr. Hamilton was her supervisor.

- **Plaintiff's Second Period of Employment.**

When plaintiff first returned to Hy–Vee, Mr. Hamilton "was normal." He did not sexually harass plaintiff or make her feel uncomfortable for approximately two weeks. However, after approximately two weeks, Mr. Hamilton began asking questions about her personal life again.

During the second time plaintiff worked for defendant, she remembers Mr. Hamilton harassed her in the following ways:

- He asked her if she had sex with her boyfriend and whether she was going to marry him;
- He asked her if she wanted to go out and get a beer with him "several times;"
- He asked her why she was still going out with her boyfriend and not with him; and
- He hugged her "sometimes."

Plaintiff's mother also witnessed other incidents during this time period. Plaintiff's mother testified that she witnessed Mr. Hamilton touch plaintiff on her back. In addition, she witnessed Mr. Hamilton play-

---

**3.** Plaintiff's mother, who worked with plaintiff in the salad bar area at Hy–Vee, testified that Jeff Scott was a "manager" and a "supervisor."

ing with two grapefruits and commenting to plaintiff, "I wish that I could play with you like this, I wish these were yours." Plaintiff's mother reported Mr. Hamilton's harassment of plaintiff to management.

Sometime at the end of October or the beginning of November, plaintiff complained to Ms. Duke, the grocery personnel manager, that Mr. Hamilton was "bothering me and bothering me with respect to my work too." Plaintiff used the word "harassment" but not "sexual harassment," and did not give any more specific information, except to say that Mr. Hamilton followed her around. Based on Ms. Duke's response to her, plaintiff believed that Ms. Duke understood her complaint was regarding sexual harassment. When plaintiff complained again to Ms. Duke, Ms. Duke responded that she had talked to Mr. Hamilton about the harassment, and that "as regards the work part of it" Ms. Duke could not do anything about it.

After plaintiff's complaint, Mr. Hamilton's attitude changed. He was rude, would not talk to plaintiff, and would not give her any instructions. Approximately one week after plaintiff complained to Ms. Duke, plaintiff told Mr. Hamilton she wanted to have a professional relationship with him and he yelled at her. Following this episode, plaintiff again went to complain to Ms. Duke. During the second meeting with Ms. Duke, plaintiff complained about Mr. Hamilton's attitude toward her. Plaintiff told Ms. Duke that it "was very personal and that somebody had to tell him something to stop this from happening, from continuing." Plaintiff explained that she meant Mr. Hamilton's "attitude toward [her] and that was it." Plaintiff did not mention sexual harassment during that meeting because plaintiff believed she already told Ms. Duke about the sexual harassment before and that Ms. Duke "had the reference already."

In the process of plaintiff's complaints to management about harassment, plaintiff indicated that she wanted to continue working for the store and that she wanted to remain in the salad bar and to keep the day shift. Plaintiff indicated, however, that she did not want to work around Mr. Hamilton.

A few days later, plaintiff complained to Ms. Duke again. During this third meeting, plaintiff gave Ms. Duke the details of the alleged harassment. This conversation took place on November 5, 1999. During this conversation, plaintiff approached Ms. Duke and indicated she was putting in her last two weeks. Ms. Duke indicated that wasn't necessary because Ms. Duke had already talked to Mr. Hamilton.

Plaintiff then indicated she wanted some kind of documentation that plaintiff had talked to Ms. Duke about the issue. Ms. Duke directed plaintiff to prepare the document. Plaintiff replied that "yes, that I would prepare some kind of a document that would prove (sic)." At that time, plaintiff's fiancee joined the conversation. Plaintiff's fiancee said "that he didn't know exactly what they called it there at the store but that was sexual harassment and asked if somebody could do something in that regard." Plaintiff testified that, in response, Ms. Duke "became very pale. You could tell that she was really shaken up when he said the word sexual harassment. . . . It wasn't until that moment that then she really started taking my conversation seriously. The other times she hadn't." Ms. Duke indicated that she was going to talk to Rob Howard, the Store Director, immediately.

Plaintiff subsequently talked to the Store Director, Rob Howard, about the alleged harassment. Mr. Howard and Ken Cox, the Perishable Foods Manager, met with Mr. Hamilton and informed him, generally, of plaintiff's allegations. Mr. Ham-

ilton admitted to some of the conduct, stating that he and plaintiff were friends and they were just joking around. After consulting with his supervisor, Mr. Howard directed Mr. Cox to terminate Mr. Hamilton's employment. Mr. Cox terminated Mr. Hamilton's employment on or about November 10, 1999. November 9, 1999 was the last day Mr. Hamilton worked for defendant.

Ms. Duke subsequently called plaintiff's boyfriend and told him that Mr. Hamilton no longer worked at Hy–Vee and that plaintiff could return to work. Plaintiff claims Ms. Duke and Mr. Howard told her she could work days.

● **Plaintiff's Employment Following Mr. Hamilton's Discharge**

Mr. Hamilton had worked at Hy–Vee for a long time and had many friends there. For example, Ms. Duke and Mr. Hamilton were friends who had socialized outside of work. Some employees were upset to learn that Mr. Hamilton's employment had been terminated.

From the time of Mr. Hamilton's termination to the time plaintiff left Hy–Vee the second time, no one held the official position of salad bar manager. However, Jason Fitts, Ken Cox, Nathan Hartley and Beth Hinkebein took over the primary management role of scheduling of employees in the salad bar area. Nathan Hartley became the next salad bar manager on December 27, 1999, after plaintiff had already left Hy–Vee.

● **Plaintiff's Alleged Non–Supervisory Retaliation**

Plaintiff claims that when she returned to work, defendant's non-supervisory employees retaliated against her by: changing the times she was supposed to work on the schedules; ignoring her; leaving notes with everyday instructions for her on them because they did not want to talk to her (plaintiff testified that she believed the notes were designed to humiliate or embarrass her); laughing at her and making comments behind her back (along with Mr. Hamilton when he came back into the store); trying to get everything done so that she had nothing to do; intentionally using all of the counter space; dropping salad containers on the table right next to her; shoving a trash can in her direction; and taking prolonged breaks together during busy times. Plaintiff also testified about an incident when Ron Deutmeyer became angry when he saw her, threw a cart to one side and threw his apron at her.

Plaintiff testified that she did not complain to anyone at Hy–Vee about the hostility problems she was having with her co-employees. However, plaintiff did testify that she complained on at least one occasion to Jason Fitts, the assistant perishable foods manager, and Ken Cox, the perishable foods manager, about other workers changing the schedules and not respecting her because of her complaints. Plaintiff did not complain to Rob Howard, the Store Director, about her problems with the scheduling until she presented him with her letter of resignation.

● **Plaintiff's Alleged Supervisory Retaliation**

Plaintiff bases her claim of retaliation by defendant's supervisors and managers on the allegations that (1) Jason Fitts inappropriately used a co-worker to give plaintiff directions; (2) managers Christina Steiger and Marcia Hardcastle engaged in hostile behavior toward her following Mr. Hamilton's discharge; (3) management inadequately responded to her concerns about her schedule; (4) Mr. Hamilton was present in the store following his discharge; and (5) management inappropriately decided that she must move to a different department in order to work the hours that she wanted. The evidence presented on these issues is as follows:

• After plaintiff had taken a 20 minute break on the clock one day, a co-worker, Vincente Ramirez, came over to take his break with her. Jason Fitts paged Mr. Ramiriz, who answered the page on a telephone in the store, and Mr. Fitts asked Mr. Ramiriz to inform plaintiff that it was time for her to return to work. Mr. Fitts would not talk directly to plaintiff, but would instead page someone to do it. Mr. Ramirez expressed concern over this practice of Mr. Fitts's and told plaintiff that he did not want to be in the middle of things that others were doing to her. No one had ever given plaintiff a hard time about her break time in the past. It only happened after her complaints. In addition, management allowed other co-workers to take long breaks. Plaintiff testified that she believed this practice with breaks was designed specifically to make plaintiff work harder during busy times.

• Plaintiff contends that following Mr. Hamilton's discharge, Christina Steiger, classified as a catering coordinator, and Marcia Hardcastle, classified as a customer service clerk, engaged in hostile actions, similar to those of the non-supervisory employees, towards plaintiff.[4] Plaintiff testified that Ms. Steiger and Ms. Hardcastle would laugh and comment in plaintiff's direction each time they took a break. In addition, these two managers were with Mr. Hamilton on one occasion when he came into the store following his discharge. They sat with him and would look over at plaintiff, make comments and begin laughing. Plaintiff did not report this behavior to anyone. Further, plaintiff testified that one of her co-workers overheard that Ms. Steiger and Ms. Hardcastle "were really going to make life impossible for me." This co-worker told plaintiff to "take care of [herself] because they were all very angry that Mike [Hamilton] had been fired." In addition, Ms. Steiger and Ms. Hardcastle would not talk to plaintiff after Mr. Hamilton's discharge.

• On November 19, 1999, plaintiff saw that she was scheduled to work some nights during the week of November 22, 1999. She went to Jason Fitts about the schedule. At this time, Mr. Fitts was the assistant perishable foods manager, but helped with the scheduling in the salad bar, because there was no salad bar manager at the time. Mr. Fitts said that he needed plaintiff to work one night a week and she agreed to do so for one or two weeks, but she made it clear that she did not want to work any other nights. Mr. Fitts then changed the schedule to eliminate the other nights that plaintiff was scheduled to work. Plaintiff had already informed management that as a result of her complaint, the Store

4. The court finds there is a genuine issue of material fact as to whether Ms. Steiger and Ms. Hardcastle were "managers" at Hy-Vee, and therefore subject to the supervisor retaliation standards under Title VII. The evidence on this issue is as follows. Plaintiff testified that these two employees (Christina and Marcia), had the classification of "manager" on their Hy-Vee name tags. In addition, another employee at Hy-Vee testified that Ms. Hardcastle was in charge of accounting. Defendant asserts that these employees were not managers. Instead, Ms. Duke's affidavit asserts that Ms. Steiger was a catering coordinator and Ms. Hardcastle was a customer service clerk. However, Ms. Duke's deposition testimony may give rise to an inference that the classification of an employee in Hy-Vee's database does not always reflect the actual job duties of an employee. Viewing the facts in the light most favorable to plaintiff, the court considers Ms. Steiger and Ms. Hardcastle as managers for purposes of this summary judgment motion.

Director and Ms. Duke had agreed that she would work only days. Plaintiff was told that they needed her to work nights because everybody wanted to work days. Plaintiff testified that management kept ignoring the agreement and constantly pressuring plaintiff to work nights in an effort to get her to quit.

- Shortly after November 19, management requested plaintiff to transfer to the grocery department. At that time plaintiff was told that they had too many people working in the mornings and they did not need anybody else. Defendant does not have a seniority system under which any employee would obtain preference pertaining to transfers or schedules based upon time served with the company. In fact, defendant's policy is to accommodate schedule requests of employees and the employees are generally accommodated.

- Again, shortly after November 19, someone wrote on the schedule to indicate that plaintiff was supposed to work from 1:00 p.m. to 9:00 p.m. on a different day. Plaintiff asserts that this schedule change had the initials "RH" on it, indicating Rob Howard, and allegedly denoting the schedule changes had been made as a result of plaintiff's complaint to Mr. Howard. Plaintiff reported this schedule change to Mr. Fitts and Mr. Cox, who indicated they would look into the matter.

Mr. Fitts determined that Ron Deutmeyer, a co-worker in the salad bar, had changed the schedule. Mr. Fitts spoke with Mr. Deutmeyer and instructed him not to do that again. Mr. Fitts already knew about Mr. Deutmeyer's conduct where he threw a cart aside and threw an apron at plaintiff.[5] In addition, Mr. Fitts, as well as Mr. Cox, had already received complaints from plaintiff that "she was sick and tired of people changing her schedule." In addition, plaintiff's mother told Mr. Fitts about the allegedly retaliatory conduct.

- Plaintiff told Mr. Fitts that her co-workers did not respect her. Plaintiff testified that her co-workers knew that plaintiff was just trying to uphold her agreement with the Store Director as a result of her complaint of sexual harassment, and the lower managers not only condoned changes in the schedule, but they themselves sought to force plaintiff to work nights. Plaintiff testified that Mr. Fitts himself ignored plaintiff in a disrespectful manner.

- Plaintiff could not testify about other times when the schedule was changed. Plaintiff never complained to Mr. Fitts about it again, nor was Mr. Fitts aware that it happened from any other source. The week of November 29, 1999, the last week in which plaintiff had any work hours, plaintiff was scheduled to work one night, and there

**5.** Ron Deutmeyer, a salad bar clerk, told manager Mr. Cox, prior to this incident, that he did not want to work with plaintiff because she could accuse him of harassment just for saying one wrong word. Mr. Deutmeyer testified that Mr. Cox assured Mr. Deutmeyer that he would not have to see plaintiff, that management would make sure she would be gone by 4:00 p.m., and that there were enough employees in the salad bar that plaintiff should not have to work nights. Shortly thereafter, Mr. Deutmeyer came in to work shortly before 5:00 p.m. while plaintiff was still at work. Mr. Deutmeyer became upset and complained to management that he would not work as long as plaintiff was around. A manager asked plaintiff what time she would be leaving, and upon learning her shift ended at 5:00 p.m., asked Deutmeyer to go home and come back to work at 5:30 p.m. It was on this occasion that Mr. Deutmeyer threw his apron at plaintiff.

is no indication that anyone inappropriately changed that schedule.

- On November 30, 1999, Mr. Hamilton came into the store, and plaintiff complained to Mr. Cox that he was in the store and was bothering her. Plaintiff testified that she was uncomfortable with Mr. Hamilton's presence in the store following his termination, and that she found it difficult to complain to the managers who were having lunch and laughing with Mr. Hamilton as friends. However, plaintiff finally did complain of his presence because Mr. Hamilton allegedly harassed plaintiff again, blocking her way into a room. Mr. Cox informed Mr. Hamilton that he could no longer come into the store. Plaintiff does not remember seeing Mr. Hamilton in the store after that.
- On December 1, 1999, Mr. Cox and Ms. Duke told plaintiff that they did not need people to work in the salad bar in the mornings. They told her that if she wanted to continue working in the mornings, she would need to move up to the front of the store to grocery. Plaintiff testified that she considered this transfer to be a demotion and that management knew plaintiff would not be comfortable with such a job. Plaintiff testified that Hy–Vee's management was aware that plaintiff wished to stay in the salad bar and would not like to be moved to another area of the store. Plaintiff told Mr. Cox and Ms. Duke that she wanted to think about the transfer. Plaintiff then called her lawyer. Plaintiff testified that she does not believe she ever got back to Mr. Cox and Ms. Duke, but simply stopped coming to work.

On December 3, 1999 plaintiff gave Rob Howard a letter of resignation drafted by her and her attorney. On March 9, 2000 plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission, alleging sexual harassment and retaliation.

- **Summary Judgment Standard**

Summary judgment is appropriate if the moving party demonstrates that there is "no genuine issue as to any material fact" and that it is "entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In applying this standard, the court views the evidence and all reasonable inferences therefrom in the light most favorable to the nonmoving party. *Adler,* 144 F.3d at 670 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A fact is "material" if, under the applicable substantive law, it is "essential to the proper disposition of the claim." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505). An issue of fact is "genuine" if "there is sufficient evidence on each side so that a rational trier of fact could resolve the issue either way." *Id.* (citing *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505).

The moving party bears the initial burden of demonstrating an absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Id.* at 670–71. In attempting to meet that standard, a movant that does not bear the ultimate burden of persuasion at trial need not negate the other party's claim; rather, the movant need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim. *Id.* at 671 (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)).

Once the movant has met this initial burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505; see *Adler,* 144 F.3d at 671 n. 1 (concerning shifting burdens on summary judgment).

The nonmoving party may not simply rest upon its pleadings to satisfy its burden. *Anderson,* 477 U.S. at 256, 106 S.Ct. 2505. Rather, the nonmoving party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler,* 144 F.3d at 671. "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Id.*

Finally, the court notes that summary judgment is not a "disfavored procedural shortcut," rather, it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action." *Celotex,* 477 U.S. at 327, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 1).

● **Plaintiff's First Period of Employment**

Plaintiff claims she was sexually harassed by Mr. Hamilton during her first period of employment with defendant. Defendant maintains that plaintiff cannot survive summary judgment on this claim because she has not timely exhausted her administrative remedies, as required by 42 U.S.C. § 2000e–5(e)(1). As set forth below, the court disagrees with defendant.

● **Exhaustion of Administrative Remedies**

■ Exhaustion of administrative remedies is a prerequisite to instituting a Title VII action in federal court. *Khader v. Aspin,* 1 F.3d 968, 970 (10th Cir.1993). A complainant must file a charge with the EEOC within 180 days of the occurrence of the alleged unlawful employment prac-

tice. 42 U.S.C. § 2000e–5(e). However, where a complainant also files a charge with a state or local agency with authority to grant or seek relief from the practice charged, the time limit for filing with the EEOC is extended to 300 days. *Id.*[6]; *Equal Employment Opportunity Comm'n v. Commercial Office Prods. Co.,* 486 U.S. 107, 110, 108 S.Ct. 1666, 100 L.Ed.2d 96 (1988).

■ In the case at hand, plaintiff does not allege, nor has she produced evidence, that she filed a complaint with the appropriate Kansas state agency. Accordingly, to timely exhaust her administrative remedies, plaintiff was required to file her charge of discrimination with the EEOC within 180 days of the alleged unlawful employment practices. She has not done this. Plaintiff's first period of employment with defendant ended on May 10, 1999. Plaintiff did not file her charge of discrimination until March 9, 2000, more than 180 days (304 days) following the end of her first period of employment with defendant. Accordingly, plaintiff has failed to file a charge of discrimination within 180 days of any alleged act of harassment occurring during her first period of employment. Accordingly, where no legal excuse for the delay exists, plaintiff's Title VII claim with respect to this first period of employment is time-barred.

● **Continuing Violation Doctrine**

Plaintiff claims that the continuing violation doctrine applies, thereby saving her otherwise untimely Title VII claim. Plaintiff asserts that the subject incidents are

---

6. 42 U.S.C. § 2000e–5(e) provides that "a charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred ... except that in a case of an unlawful employment practice with respect to which the person aggrieved has initially instituted proceedings with at State or local agen-

cy with authority to grant or seek relief from such practice or to institute criminal proceedings with respect thereto upon receiving notice thereof, such charge shall be filed by or on behalf of the person aggrieved within three hundred days after the alleged unlawful employment practice occurred ..."

"part and parcel of a pattern of discrimination ... that persisted until the end of plaintiff's second [period] of employment." Specifically, plaintiff argues that the acts occurring during the first period of employment and those occurring during the second period of employment "are sufficiently related, thereby constituting a continuing pattern of discrimination." *Hunt v. Bennett*, 17 F.3d 1263, 1266 (10th Cir.), cert. denied, 513 U.S. 832, 115 S.Ct. 107, 130 L.Ed.2d 55 (1994). The court agrees.

The continuing violation doctrine "permits a Title VII plaintiff to challenge incidents that occurred outside the statutory time limitations of Title VII if such incidents are sufficiently related and thereby constitute a continuing pattern of discrimination." *Id.* To determine whether plaintiff's alleged acts of discrimination constitute a continuing violation, the court must consider three factors:

> (i) subject matter—whether the violations constitute the same type of discrimination; (ii) frequency; and (iii) permanence—whether the nature of the violations should trigger an employee's awareness of the need to answer her rights and whether the consequences of the act would continue even in the absence of a continuing intent to discriminate."

*Martin v. Nannie and Newborns, Inc.*, 3 F.3d 1410, 1415 (10th Cir.1993). Whether the doctrine applies necessarily "turns on the facts and context of each particular case." *Berry v. Bd. of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983), cert. denied, 479 U.S. 868, 107 S.Ct. 232, 93 L.Ed.2d 158 (1986); see also *Martin*, 3 F.3d at 1415 (noting that the Tenth Circuit "adopted the approach taken by the Fifth Circuit in *Berry v. Board of Supervisors of Louisiana State Univ.*, 715 F.2d 971, 981 (5th Cir.1983)" to evaluate applicability of continuing violation doctrine). Further, the "particular context of individual employment situations requires a fact-specific inquiry by a trial judge which cannot be easily reduced to a formula." *Id.*

Upon applying these factors, the court finds the first two factors weigh in favor of plaintiff and the third in favor of defendant. Upon consideration of the factors as a whole, however, the court determines that the alleged acts of harassment occurring during plaintiff's first period of employment and those occurring during her second period of employment constitute a continuing violation.

First, the subject matter of the harassment occurring during both periods of plaintiff's employment are similar. This is not a case where the alleged discriminatory acts during the two periods of employment are discrete unrelated acts. Plaintiff contends that Mr. Hamilton engaged in sexually harassing behavior towards her during both periods of time. Further, as set forth in the facts above, the alleged harassing acts are the same or similar during both periods.

Second, plaintiff contends that the harassment by Mr. Hamilton occurred with relative frequency and consistency during both periods of employment. This is not an instance where the alleged occurrences are "relatively infrequent when compared to the length of time addressed in [plaintiff's] complaint." *Holmes v. Regents of Univ. of Colo.*, No. 98–1172, 1999 WL 285826, at *4 (10th Cir., May 7, 1999) (unpublished). Instead, plaintiff contends Mr. Hamilton engaged in harassing behavior for a period of seven to nine months (first period of employment) where he would sexually harass her three to four times each time she worked with him, which averaged three to four times per week. In addition, plaintiff contends that during at least two weeks of the month she worked with Mr. Hamilton during her second period of employment, Mr. Hamilton

again engaged in sexually harassing behavior. Similar to the plaintiff's contentions in Martin, wherein the Tenth Circuit concluded plaintiff had introduced sufficient facts to raise a triable issue as to whether a continuing course of discrimination occurred, plaintiff here contends that defendant allowed an atmosphere of sexual harassment to exist even after plaintiff gave them notice that a hostile work environment may exist. *Martin*, 3 F.3d at 1416. Also similar to the contentions in Martin, plaintiff here contends that she was retaliated against based upon her complaints of sexual harassment and the resulting termination of the harasser's employment. *Id.*

Defendant argues that the five month break in plaintiff's employment, and consequently the five month break in the alleged harassing behavior, is sufficient to preclude application of the continuing violation doctrine. The court disagrees. Defendants provide no support for their argument and, upon its own search, the court is unable to find direct support for the proposition. Under the circumstances of this case, where the frequency and subject matter of the alleged harassment were identical during the first and second periods of employment and only five months separated the two periods, the court finds plaintiff's break in service does not preclude application of the doctrine.

Third, in considering the final factor, the court recognizes that plaintiff had reason to believe she was a victim of discrimination during the first period of employment. Plaintiff has produced evidence to support her contention that during her first period of employment Mr. Hamilton sexually harassed her. Further, plaintiff's evidence demonstrates that she believed she was a victim of harassment during that first peri-

od. Specifically, plaintiff testified that she complained to Jeff Scott about Mr. Hamilton's harassing conduct three times, beginning in March 1999. In addition, plaintiff testified that she left her employment at Hy–Vee **because of** Mr. Hamilton's harassment and because she was fearful of retaliation against herself and her mother based on her complaints about Mr. Hamilton. Clearly, plaintiff was on notice that she was being discriminated against during her first period of employment.[7]

■ The court recognizes the principle that the continuing violation doctrine "is premised on the equitable notion that the statute of limitations should not begin to run until a reasonable person would be aware that his or her rights have been violated." *Id.* at 1415 n. 6. Further, the court notes the Tenth Circuit has recently recognized that a continuing violation claim "will likely fail if the plaintiff knew, or through the exercise of reasonable diligence would have known, she was being discriminated against at the time the earlier events occurred." *Bullington v. United Air Lines, Inc.*, 186 F.3d 1301, 1311 (10th Cir.1999).

■ However, given the analysis under the first two factors, upon consideration of the evidence presented as a whole, and considering that whether the continuing violation doctrine applies "turns on the facts and context of each particular case," *Berry*, 715 F.2d at 981, the court finds the continuing violation doctrine applies in the case at hand. Specifically, as in Martin, the court here finds that plaintiff has "shown enough to avoid summary judgment on the statute of limitations issue." *Martin*, 3 F.3d at 1416. Where evidence developed at trial indicates otherwise, and if requested by either party, the court will

---

**7.** At this portion of its order, the court does not reach the issue of whether the acts occurring during plaintiff's first period of employ-

ment with defendant are actionable harassment under Title VII.

determine whether it is appropriate for the fact finder to consider whether the continuing violation doctrine precludes recovery on any of plaintiff's claims. Finally, the court notes that its decision is not at odds with the Supreme Court's recognition that one of the purposes of the limitations period is to "protect employers from the burden of defending claims arising from employment decisions that are long past." *Delaware State Coll. v. Ricks*, 449 U.S. 250, 256–57, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980).

Accordingly, because the continuing violation theory is applicable in this case, plaintiff's Title VII claim based on the alleged acts of defendant occurring during plaintiff's first period of employment are not time-barred. Defendant's motion seeking judgment on plaintiff's claims based on her first period of employment is denied.

### ● Plaintiff's Second Period of Employment

### ● Hostile Work Environment

Defendant asserts that the conduct plaintiff contends occurred during her second period of employment does not constitute actionable harassment. In order to state a prima facie case of sexual harassment, plaintiff must establish that the harassment was "sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Where the alleged harassment is not sufficiently severe or pervasive from both a subjective and objective perspective, plaintiff's claim is not actionable.

Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview. Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation.

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21–22, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

Defendant argues that because the continuing violation doctrine is inapplicable in this case, the court is "jurisdictionally limited" to considering only the alleged acts of harassment occurring during the second period of plaintiff's employment. As noted above, the continuing violation theory is applicable in the instant case, thereby allowing the fact finder to consider alleged acts of harassment occurring in both the first and second periods of employment when considering whether plaintiff has stated a prima facie case of sexual harassment.

Defendant does not argue that the alleged acts of harassment, when considered in total, fail to rise to the level of actionable harassment. Accordingly, the court finds it unnecessary to determine whether, as defendant alleges, acts occurring solely during the second period of employment are sufficiently severe or pervasive. Defendant's motion on this basis is denied.

### ● Retaliation

Plaintiff alleges that both her co-employees and defendant's management retaliated against her for complaining about Mr. Hamilton's allegedly harassing behavior. Defendant asserts that plaintiff is unable to establish a prima facie case of co-worker retaliation and that plaintiff is both unable to establish a prima facie case of supervisor retaliation and unable to establish that defendant's legitimate nondiscriminatory reasons for their actions were a pretext for unlawful discrimination.

### • McDonnell Douglas Burden Shifting

As plaintiff has presented no direct evidence of retaliatory motive, the court reviews plaintiff's retaliation claims under the McDonnell Douglas burden shifting analytical framework. *McDonnell Douglas v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In the summary judgment context, plaintiff must raise a genuine issue of material fact on each element of her prima facie case. *Lowe v. Angelo's Italian Foods, Inc.,* 87 F.3d 1170, 1174 (10th Cir.1996). Once plaintiff has established a prima facie case, the burden shifts to the defendant to offer a legitimate nondiscriminatory reason for its employment decision. Randle v. City of Aurora, 69 F.3d 441, 451 (10th Cir.1995). If the defendant meets this burden, the burden again returns to the plaintiff to show that "there is a genuine dispute of material fact as to whether the employer's proferred reason for the challenged action is pretextual." *Id.*

Pretext may be established by "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proferred legitimate reasons for its actions that a reasonable fact finder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Olson v. Gen. Elec. Astrospace,* 101 F.3d 947, 951–52 (3d Cir.1996) (internal quotations omitted). "[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment." *Branson v. Price River Coal Co.,* 853 F.2d 768, 772 (10th Cir.1988).

### • Co–Worker Retaliation

Defendant contends that plaintiff's claims of co-worker retaliation are not actionable because defendant was not aware of the alleged retaliation. To incur liability for retaliation under Title VII, an employer must be aware of the alleged retaliatory conduct. *Gunnell v. Utah Valley State Coll.,* 152 F.3d 1253, 1265 (10th Cir.1998). To state a claim of Title VII retaliation, plaintiff must show: (1) that she engaged in protected activity; (2) that she suffered an adverse employment action; and (3) that the adverse employment action was causally related to her protected activity. *Sanchez v. Denver Pub. Sch.,* 164 F.3d 527, 533 (10th Cir.1998). Although "[c]o-worker hostility or retaliatory harassment, if sufficiently severe, may constitute an 'adverse employment action' for purposes of a retaliation claim," there are limits on the employer's liability in this context. *Gunnell,* 152 F.3d at 1265.

[B]ecause harassment must be intentional on the part of the employer, we hold that an employer can only be liable for co-workers' retaliatory harassment where its supervisory or management personnel either (1) orchestrate the harassment or (2) know about the harassment and acquiesce in it in such a manner as to condone and encourage the co-workers' actions. An employer may not be held liable for the retaliatory acts of co-workers if none of its supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions, and no such management participation could occur if the supervisory or management-level personnel did not actually know of the co-workers' retaliation.

*Id.* (internal citation omitted).

In the instant case, the evidence shows that management was not aware of the majority of the alleged co-worker retaliatory actions, with two exceptions. First, plaintiff complained to Jason Fitts, the assistant perishable foods manager, that someone changed her work schedule to an evening schedule, despite the fact that she had made an agreement with

other management to work only days. Mr. Fitts indicated he would look into the matter. Subsequently, Mr. Fitts determined Ron Deutmeyer, a co-worker in the salad bar, had changed plaintiff's work schedule. The evidence shows Mr. Fitts spoke to Mr. Deutmeyer and instructed him not to engage in that behavior again. Following this, there is no evidence that any co-worker changed plaintiff's schedule again or that plaintiff complained about an impermissible change in her schedule again.

Second, viewing the facts in a light most favorable to plaintiff, it can be inferred that management had knowledge of the incident following Mr. Hamilton's discharge where Mr. Deutmeyer became angry when he saw plaintiff, threw a cart to one side and threw his apron at her. As noted in the facts above, prior to this incident, Mr. Deutmeyer told Mr. Cox, the perishable foods manager, that he did not want to work with plaintiff because she could accuse him of harassment just for saying one wrong word. Mr. Deutmeyer testified that Mr. Cox assured Mr. Deutmeyer that he would not have to see plaintiff, that management would make sure she would be gone by 4:00 p.m, and that there were enough employees in the salad bar that plaintiff should not have to work nights. Shortly thereafter, Mr. Deutmeyer came in to work before 5:00 p.m., while plaintiff was still at work. Mr. Deutmeyer became upset and complained to management that he would not work as long as plaintiff was around. A manager asked plaintiff what time she would be leaving, and upon learning her shift ended at 5:00 p.m., asked Deutmeyer to go home and come back to work at 5:30 p.m. It was on this occasion that Mr. Deutmeyer threw his apron at plaintiff. There is no evi-

dence that plaintiff complained about Mr. Deutmeyer's actions to management, and the record is not clear regarding how or when management became aware of the incident.

Viewing the facts in the light most favorable to plaintiff and drawing all reasonable inferences in her favor, the court finds Hy–Vee's management was aware of both of the incidents described here; however, there is no evidence that management "[knew] about the harassment and acquiesce[d] in it in such a manner as to condone and encourage the co-workers' actions." *Gunnell,* 152 F.3d at 1265. Accordingly, defendant may not be held liable for the retaliatory acts of plaintiff's co-workers where, as here, there is no evidence that "its supervisory or management-level personnel orchestrated, condoned, or encouraged the co-workers' actions." *Id.*

Therefore, defendant may not incur liability for the alleged co-worker retaliation as alleged by plaintiff.[8] Defendant's motion seeking judgment on plaintiff's Title VII claims based on the alleged retaliatory acts of her co-workers is granted.

● **Supervisory Retaliation**

Defendant contends that plaintiff's claims of supervisor retaliation are not actionable because (1) plaintiff is unable to establish a prima facie case of retaliation because she has presented no evidence to show she suffered an adverse employment action as a result of the alleged retaliatory behavior and she is unable to establish a causal connection between the alleged retaliatory behavior and the alleged adverse employment action; and (2) plaintiff is unable to rebut defendant's legitimate non-

---

**8.** Given this finding, the court finds it unnecessary to reach defendant's second argument that the alleged co-worker retaliation was not

sufficiently severe or pervasive to constitute an "adverse employment action."

discriminatory reason for its actions with evidence of pretext.

● **Prima Facie Case of Supervisor Retaliation**

■ To state a prima facie case of retaliation under Title VII, plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action contemporaneous with or subsequent to such opposition; and (3) a casual connection links the protected activity and the adverse employment action. *Penry v. Federal Home Loan Bank of Topeka,* 155 F.3d 1257, 1263 (10th Cir.1998), cert. denied, 526 U.S. 1039, 119 S.Ct. 1334, 143 L.Ed.2d 498 (1999). Plaintiff can establish the causal connection by "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tel. Co. of Kan., Inc.,* 683 F.2d 339, 343 (D.Kan.), cert. denied, 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982).

● **Adverse employment action**

Plaintiff contends that the following acts carried out by defendant's supervisors following her complaints about Mr. Hamilton's behavior, constitute adverse employment actions within the meaning of Title VII:(1) Plaintiff contends that rather than talking to her personally, Jason Fitts paged Mr. Ramirez, plaintiff's co-worker, over the store intercom and instructed Mr. Ramirez to inform plaintiff that her break was over and she must return to work; (2) Plaintiff contends that management's response to her concerns over her working hours was inadequate and that she was given an "ultimatum" that if she would not work nights in the salad bar, she would be transferred out of the salad bar and up to the front of the store where she could work mornings sacking groceries; and (3) Plaintiff contends that two managers,

Christina Steiger (catering coordinator) and Marcia Hardcastle (customer service clerk) engaged in hostile actions towards her in retaliation for her complaints to management about Mr. Hamilton. Specifically, plaintiff testified that Ms. Steiger and Ms. Hardcastle would laugh and comment in plaintiff's direction each time they took a break. In addition, these two managers were with Mr. Hamilton on one occasion when he came into the store following his discharge. They sat with him and would look over at plaintiff, make comments and begin laughing. Further, plaintiff testified that a co-worker overheard that Ms. Steiger and Ms. Hardcastle "were really going to make life impossible for me." The co-worker then told plaintiff to "take care of [herself] because they were all very angry that Mike [Hamilton] had been fired." In addition, these two individuals would not talk to plaintiff after Mr. Hamilton's discharge.

■ The Tenth Circuit has explained the Circuit's view of an adverse employment action:

The Tenth Circuit liberally defines the phrase "adverse employment action." See *Gunnell v. Utah Valley State College,* 152 F.3d 1253, 1264 (10th Cir.1998); *Jeffries v. Kansas,* 147 F.3d 1220, 1232 (10th Cir.1998). Such actions are not simply limited to monetary losses in the form of wages or benefits. See *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986–87 (10th Cir.1996). Instead, we take "a case-by-case approach," examining the unique factors relevant to the situation at hand. *Jeffries,* 147 F.3d at 1232. Nevertheless, we will not consider "a mere inconvenience or an alteration of job responsibilities" to be an adverse employment action. *Crady v. Liberty Nat'l Bank & Trust Co.,* 993 F.2d 132, 136 (7th Cir.1993); see also *Burlington Indus., Inc. v. Ellerth,* 524 U.S. 742, 761,

118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) (conduct is adverse employment action if it "constitutes a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits"); *Spring v. Sheboygan Area Sch. Dist.*, 865 F.2d 883, 886 (7th Cir.1989) (principal's change in assignment was not an adverse employment action despite her increased commute and belief that the public perceived the transfer "as a 'nudge towards retirement' ").

*Sanchez,* 164 F.3d at 532. Therefore, "[r]etaliatory conduct other than discharge or refusal to hire is thus proscribed by Title VII only if it alters the employee's 'compensation, terms, conditions, or privileges of employment,' or 'adversely affect[s] his status as an employee.' " *Id.* (quoting *Robinson v. City of Pittsburgh,* 120 F.3d 1286, 1300 (3d Cir.1997)).

Plaintiff argues that defendant's action in forcing plaintiff to transfer to the front of the store is adverse because " 'reasonable [people]' would consider it such." This is true, plaintiff argues, because the job duties at the front of the store would require her to interact with customers, a difficult task for plaintiff due to her limited English language proficiency. Therefore, plaintiff argues this lateral transfer, thought not affecting her pay or benefits, was an adverse action because it entailed "harder" or "less important work." Accordingly, plaintiff argues her evidence is sufficient to establish an adverse employment action.[9] In contrast, defendant argues that the transfer from the salad bar to the front of the store was not adverse

because it did not affect plaintiff's pay or benefits and it would have allowed plaintiff to work the hours that she wanted to work.

Plaintiff does not set forth separate arguments regarding the additional two allegations of adverse employment actions and, as to both of these instances, defendant argues that because these allegations of adverse action "had absolutely no effect on plaintiff's employment position," and therefore, they may not be adverse employment actions.

■ The court finds, when viewing the evidence presented in the light most favorable to plaintiff, and when considering the "case-by-case approach" required by the Tenth Circuit, *Jeffries v. Kansas,* 147 F.3d 1220, 1232 (10th Cir.1998), that plaintiff *has not* presented evidence of an adverse employment action for purposes of establishing her prima facie case of retaliation based on supervisor retaliation.

■ First, regarding the lateral transfer to the front of the store, plaintiff has not shown how such transfer effectuated a material change in the terms or conditions of her employment, thereby rising to the level of an adverse employment action. A *"purely* lateral transfer, that is, a transfer that does not involve a demotion in form or substance, cannot rise to the level of a materially adverse employment action." *Williams v. Bristol–Myers Squibb Co.,* 85 F.3d 270, 274 (7th Cir.1996). "A transfer involving no reduction in pay and no more than a minor change in working conditions will not do, either." *Id.*

The lateral transfer to the front of the store does not "constitute[ ] a significant

---

9. Plaintiff also contends that other employees in the salad bar who wanted to work days for personal reasons were not forced to transfer to a different department; however, she has not pointed to that portion of the record sup-

porting her contention. Therefore, as plaintiff has not set forth any evidence on this issue, the court will not consider it in its analysis.

change in employment status." *Id.* Based on plaintiff's testimony that working in the front of the store would be more difficult for her due to her lack of English language proficiency, the transfer is clearly an "inconvenience" to plaintiff. Further, working in the front of the store would involve sacking groceries and interacting with customers, rather than performing tasks related to the salad bar and thereby, the transfer position does "alter[ ][her] job responsibilities." However, such inconvenience or alteration of job responsibilities is not an adverse employment action according to Tenth Circuit precedent. *Sanchez,* 164 F.3d at 532. In addition, the plaintiff concedes that the transfer would not materially affect her wages or her benefits. Given these facts, the court finds plaintiff has not established that her lateral transfer to the front of the store constitutes an adverse employment action.

 Second, regarding Mr. Fitts's telephone page to a co-worker and the actions of Ms. Steiger and Ms. Hardcastle, plaintiff has not shown how such actions effectuated a material change in the terms or conditions of her employment, thereby rising to the level of an adverse employment action. Generally, actions of supervisors which make plaintiff feel isolated, or create unpleasant encounters are not "sufficiently negative and pervasive to create an adverse employment action." *Amro v. Boeing Co.,* 232 F.3d 790, 798 (10th Cir.2000) (finding "unpleasant and vulgar" encounters plaintiff had with supervisor following plaintiff's indication that he thought the supervisor was discriminating against him did not rise to level of adverse employment action, where supervisor called plaintiff a vulgar name, placed his hands around the plaintiff's neck and patted him down to ascertain whether plaintiff had a tape recorder, threw drawing papers at plaintiff, demanded to search plaintiff's folder, and spoke unpleasantly to plaintiff); *Heno v. Sprint/United Mgmt. Co.,* 208 F.3d 847,

857–58 (10th Cir.2000) (finding supervisor's conduct did not affect her employment status and amount to adverse employment action where plaintiff did not incur change in pay or benefits despite facts that plaintiff's desk was moved to different locations, her supervisor and coworkers acted in a "chilly" manner towards her making her feel isolated, the human resources department refused to investigate her complaint after learning plaintiff filed an EEOC complaint, and supervisor suggested plaintiff may wish to transfer to another department due to a change in commission format in which plaintiff had previously struggled). The court finds that the retaliatory conduct as alleged, did not "significantly affect [plaintiff's] employment status and, therefore, did not constitute an adverse employment action remediable under Title VII." *Sanchez,* 164 F.3d at 533.

● **Causal connection**

Plaintiff alleges that the close proximity in time between plaintiff's complaints and management's decision to give plaintiff "an ultimatum of working nights in the salad bar or be transferred to sack groceries, despite the agreement [with Ms. Duke and Mr. Howard] regarding the day schedule" illustrates a causal connection between her protected activity and the adverse employment action. Where plaintiff is able to show a close proximity in time between the alleged retaliatory acts and the protected conduct, a causal connection may be inferred. *Medlock v. Ortho Biotech, Inc.,* 164 F.3d 545, 550 (10th Cir.1999), cert. denied, 528 U.S. 813, 120 S.Ct. 48, 145 L.Ed.2d 42 (1999).

However, even if the court were to find plaintiff had demonstrated a sufficient causal connection as to her allegations,

thereby satisfying the third element of her prima facie case, plaintiff is unable to meet her burden to establish a prima facie case because she is unable to establish the second element, i.e., that she suffered an adverse employment action.

Accordingly, because plaintiff is unable to establish a prima facie case of retaliation based on alleged acts of her supervisors and/or managers, defendant's motion seeking judgment on plaintiff's Title VII claims based on the alleged retaliatory acts of her supervisors and/or managers is granted.[10]

● **Order**

IT IS THEREFORE ORDERED that defendant's motion for summary judgment (Doc. 43) is granted in part. Plaintiff's claims regarding co-worker and supervisor retaliation are dismissed from plaintiff's complaint.

Accordingly, following this order, only plaintiff's claims regarding Title VII sexual harassment (based upon actions taken during plaintiff's first and second periods of employment) remain pending.

**IT IS SO ORDERED.**

---

10. Given the court's finding that plaintiff has failed to state a prima facie case of supervisor retaliation, it finds it unnecessary to reach defendant's arguments regarding pretext.